**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eddie Abel, | No. CV-17-01248-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Bridgeway Advantage Solutions Incorporated, et al., | |
| Defendants. | |
| Covenant Consumer Direct LLC, | |
| Third-Party Plaintiff, | |
| v. | |
| Destry Rogers, | |
| Third-Party Defendant. | |

Pending before the Court are the Motions for Summary Judgment of Defendants Covenant Consumer Direct LLC (Doc. 71) and Bridgeway Advantage Solutions Inc. (Doc. 73).[1] For the following reasons both motions are granted.

## BACKGROUND

Plaintiff Eddie Abel lives with and cares for Destry Rogers, his significant other. Rogers has a physical handicap and requires help with many daily tasks and activities. Abel provides that help, and during the period relevant to this action he was compensated

---

[1] The parties have requested oral argument. The requests are denied. The parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

for some of his work through a program established under the Arizona Health Care Cost Containment System Administration ("AHCCCS"), Arizona's Medicaid program. Defendant Bridgeway Advantage Solutions is a managed care organization ("MCO") and contracted with the AHCCCS to coordinate services for individuals who qualify for the Arizona Long Term Care Services program.

Defendant Covenant Consumer Direct ("CCD") works with MCOs like Bridgeway to provide services to AHCCCS recipients. CCD provides three models of care. The first model is the traditional agency-based model. In this model, CCD employs the caregiver and takes care of recruiting, hiring, firing, and training. It supervises the certification, training and performance of the caregiver. These caregivers are referred to as "direct-care workers" ("DCW").

The second model is the "agency with choice" model—a co-employment model. In this model the AHCCCS member (*i.e.*, the person receiving care) is the co-employer of the caregiver. The member has the power to dismiss the caregiver—they can terminate their responsibilities to the member but cannot terminate the caregiver's employment. Wages are determined and paid by CCD.

The third model is the "self-directed attendant care" ("SDAC") model and is entirely self-directed by the member. This model provides the greatest flexibility for members and allows them to hire their own family members or friends as their caregiver. The member is the employer of the "attendant care worker" ("ACW"). CCD works with the member as a "fiscal employer agent" to handle things like payroll services. The member sets the ACW's wage from a range of state-established pay rates. The member recruits, hires, trains, and fires the ACW. CCD must authorize an "Okay to Work Form" before the ACW can begin work and issues paychecks to the ACW based on the number of work hours authorized by the MCO and verified by the member. The ACW chooses the method of payment. CCD, in turn, is compensated on a per-member basis from MCOs like Bridgeway. That payment rate does not depend on the number of hours the caregiver works in a given month.

During the period relevant to this case, Rogers participated in some of these programs. She hired Abel, her significant other, as her caregiver through an agency called ResCare in late 2014. The next year, Rogers switched to CCD. Working with her Bridgeway case manager, Rogers developed a Plan of Care to meet her care needs. The Plan set forth the services that Rogers indicated she needed. Bridgeway qualified her for thirty-two hours of paid care per week and authorized payment for those hours. If Rogers felt that she needed additional care beyond what was outlined in the Plan, she could ask Bridgeway to approve the extra hours for that week. She also had the ability to request an increase of hours per week for which she qualified, and she did so on multiple occasions. There is no evidence that Rogers ever appealed a denial of those requests through the appropriate administrative channels.[2]

Rogers initially signed a service agreement with CCD on March 15, 2015 (the "March Agreement"). The March Agreement was for either CCD's first or second care models, in which Abel would be employed as a DCW by CCD to care for Rogers. (Doc. 82-1 at 3–6). Less than six weeks later, on April 30, however, Rogers signed up for the SDAC program when she learned that she would be able to pay Abel a higher wage under that program. She signed a Self-Directed Attendant Care Agreement with Abel, outlining the employer-employee relationship that would exist with Abel working as Roger's ACW. (Doc. 72 at 196–97). Rogers and Abel also signed a Wage Memo, setting his pay at $10.90 per hour for a maximum of up to the thirty-two hours per work for which Rogers was authorized to receive reimbursed care under the AHCCCS program.

Rogers also signed a Self-Directed Attendant Care Agreement, (*id.* at 199), and Fiscal and Employer Agency Services and Employer of Record Agreement. (*Id.* at 200–04). Both documents outlined Rogers' responsibilities as Abel's employer and CCD's limited role in that relationship. CCD's responsibilities included providing an initial

---

[2] The AHCCCS Medical Policy Manual explains that the case manager (here, a Bridgeway employee) is responsible for "[p]roviding the member with a written notice of action that explains the member's right to file an appeal if the member disagrees with the authorization of SDAC services (including the amount/frequency of a service)." (Doc. 72 at 60).

training packet, dispensing payment to Abel on a bi-weekly schedule according to hours approved by Rogers, providing worker's compensation as directed by state law, and various payroll functions. (*Id.* at 202). As part of those agreements, Rogers acknowledged that she was responsible for "payment of any wages and expenses that exceed the amount authorized in [her] authorized plan, are the result of overtime worked by the ACW, or are the result of overlap of services—two ACWs working at the same time." (*Id.* at 201). By signing the Employee Agreement, Abel acknowledged that "I understand that Covenant Consumer Direct is not financially responsible for payment of services I provide to the Member in situations where: . . . [t]he Member/PR allows me to work overtime (hours in excess of 40 per week unless approved in advance by Covenant Consumer Direct)." (Doc. 72 at 197).

Between 2015 and 2018, Abel worked as Rogers' ACW and was compensated by CCD for the authorized hours per week that he worked. There are no allegations or evidence that Abel was not paid for the number of approved hours so long as he worked that many hours and timely submitted the proper documentation to CCD. During this period, Rogers and Abel informed Bridgeway that Abel was working in excess of forty hours per week caring for Rogers and asked that he be compensated for at least forty hours instead of only thirty-two. In 2018 Bridgeway increased Rogers' authorized hours per week from thirty-two to forty.

In spring 2018, Abel underwent shoulder surgery and was unable to work. Rogers had some difficulty locating a replacement ACW under CCD's program, and her new MCO, United Healthcare, helped her find another service provider. United then sent CCD a closure authorization because it had transferred Rogers' in-home care services to another agency. Pursuant to that direction from United, CCD ended its services to Rogers, and no longer dispensed payment to Abel.

Abel then filed this action, alleging that he worked hours of overtime every week for which he was not compensated by CCD or Bridgeway. He also alleges that CCD and Bridgeway failed to pay him the minimum wage required by both federal and Arizona law.

For these alleged violations he seeks unpaid overtime wages and compensation for unpaid minimum wages.

## DISCUSSION

### I. Legal Standards

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. Pro. 56(c)(1). If the non-moving party's opposition fails to do so, the court is not required to comb through the record on its own to come up with reasons to deny a motion for summary judgment. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

### II. Analysis

Under the various agreements entered by Rogers and Abel, Rogers is eligible to receive a certain number of hours of reimbursed care as a beneficiary of the government-funded AHCCCS program. If she wishes to increase the reimbursed hours of care for which she is eligible, there is a separate method by which she can seek such authorization that is subject to administrative rather than federal court review. *See* Ariz. Admin. Code

R9-34-201 *et seq*. She cannot increase the authorized number of reimbursed hours by simply directing her caregiver—who also happens to be her significant other who lives with her—to work more hours than her MCO authorizes, and then claim that an alleged co-employer violated overtime and minimum wage laws by not paying her caregiver for those extra, unauthorized hours. And given the law, the uncontested facts demonstrate that neither Defendant was the co-employer of Abel to the extent he worked hours beyond the authorized weekly allotment.

Overtime or minimum-wage liability under the Fair Labor Standards Act ("FLSA"), as well as minimum-wage liability under the relevant Arizona statute, is predicated on the existence of an employer-employee relationship. *See* 29 U.S.C. § 216(b); A.R.S. § 23-363(A). The question of whether CCD or Bridgeway were Abel's joint employers is a question of law. *See Martinez v. Ehrenberg Fire Dist.*, No. CV-14-00299-PHX-DGC, 2015 WL 3604191 at *2 (D. Ariz. June 8, 2015). The Arizona Minimum Wage Act looks to the standards of the FLSA to determine whether someone qualifies as an employee, A.R.S. § 23-362(D), so resolution of this issue requires only a single analysis.

Parties do not dispute that Rogers was Abel's employer. Abel alleges, however, that CCD and Bridgeway were his joint employers, and are therefore liable for the payment overtime wages he alleges he worked. Under the FLSA, "[a] determination of whether the employment by the employers is to be considered joint employment . . . depends on the facts in the particular case." 29 C.F.R. § 791.2(a). In this Circuit, "the concept of joint employment should be defined expansively under the FLSA." *Chao v. A-One Med. Servs., Inc.,* 346 F.3d 908, 917 (9th Cir. 2003). To determine whether an entity qualifies as a joint employer, the Ninth Circuit applies an "economic reality" test. *See Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997). That test looks to the "circumstances of the whole activity," and specifically examines four factors. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983). Courts ask "whether the alleged employer: (1) had the power to hire and fire the employee[], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method

of payment, and (4) maintained employment records." *Id.*

## A. Covenant Care Direct's Motion for Summary Judgment

CCD is entitled to summary judgment. The nub of the dispute centers on what type of care provider Abel was to Rogers, because the answer to that question informs the *Bonnette* test.

Abel's responses to CCD's motion for summary judgment rest on the premise that he was hired as a DCW by CCD. But *Rogers* hired Abel as an *ACW*, not a DCW. The undisputed evidence establishes this. Rogers and Abel signed a "Self-Directed Attendant Care Employee Agreement" on April 30, 2015. That agreement detailed the arrangement between Rogers and Abel. In the agreement, Abel acknowledges that Rogers "elected to hire [him] for the position of Attendant Care Worker (ACW) to perform attendant care services for [Rogers] in accordance with Arizona's Self-Directed Attendant Care (SDAC) program." (Doc. 72 at 196). Thus, there is no material dispute of fact that when Abel was providing services to Rodgers he was an ACW, not a DCW.

Abel points to the March Agreement to dispute this conclusion. But Abel was not a party to the March Agreement—it created no legal relationship created between Abel and CCD. It was between Rogers and CCD. (*See* Doc 82-1 at 3) ("This Agreement is made between Covenant Consumer Direct Personal Care, LLC, . . . and . . . Destry Rogers."). In any event Abel presents no facts suggesting that even if he was a DCW, Rogers had the authority to direct him as a DCW to provide services to her that exceeded her approved level of benefit and for which either of the Defendants would be liable.

Second, the March Agreement predates (and was replaced by) the April Agreement, to which Abel was a party. And the April Agreement clearly creates a relationship between Rogers and Abel in which Abel was working as an ACW. Third, the rest of the evidence suggests that he was working as an ACW outside the management authority of CCD. For example, Rogers herself testified that Abel did not need CCD's authorization before taking time off. (Doc. 72 at 140–41). Rogers also testified that CCD was not involved in her selection of Abel as her ACW. (Doc. 72 at 92). When CCD's relationship with Rogers

and Abel ended, it was at the direction of United Healthcare, Rogers' managed care organization. (Doc. 83 at 39). United Healthcare changed Rogers' service provider, which is why CCD informed Abel that it would no longer be paying him to care for Rogers. (*Id.*). CCD never "fired" Abel. Rather, it terminated its relationship with Rogers after being directed to do so by United.

Abel also points to a second document that he argues establishes his status as a DCW. On April 30, 2015—the same day Abel and Rogers entered the agreement setting up Abel's status as an ACW—CCD issued an "Approval to Begin Work" form authorizing Abel to begin work as a *DCW*. (Doc. 82-1 at 2). The form was never signed by Abel and he was not given a copy. Yet on the same day, CCD issued an "Okay to Begin FEA Services" form to Rogers, stating that Rogers was employing Abel in the SDAC program. (Doc. 83 at 54). This program is the program for which Abel and Rogers entered the April Agreement, under which Abel would be an ACW. The two forms, issued the same day, are thus inconsistent with one another.

This inconsistency is explained by a declaration from Leslie Mitchell, Senior Director of Operations for CCD. Mitchell explains that the Approval to Begin Work form contained in Abel's file was filed in error, and CCD should have instead filed an Approval to Being Work form for the SDAC program, which is what Rogers and Abel had signed up for that same day. (Doc. 83 at 38). Abel points to no evidence to rebut this explanation for the inconsistent documents. The rest of the evidence also supports the conclusion that Abel worked as an ACW and that the form he relies on was filed by mistake.

In sum, then, the evidence establishes that Abel worked as an ACW and that Rogers was his employer. The evidence Abel points to does not contradict that conclusion. Rather, Abel offers only an agreement to which he was not party (and which was replaced approximately one month later) and a document filed by CCD by mistake. Neither of those documents establishes that Abel was in fact a DCW rather than an ACW.[3] And even if it

---

[3] Abel also cites his own declaration and one made by Destry Rogers. However, a party cannot rely on "conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

did there is no suggestion that Rodgers had the authority to direct a DCW to provide care that would exceed her maximum AHCCCS benefit.

Those conclusions in turn inform the Ninth Circuit's "economic reality" test for determining whether CCD was Abel's joint employer. *See Torres-Lopez*, 111 F.3d at 639.

*Whether CCD had power to hire or fire Abel*. While CCD issued an "Approval to Begin Work" form, it did not have power to hire or fire Abel. As outlined in the "Self-Directed Attendant Care Employee Agreement," Destry Rogers is the employer, not CCD.[4] The FEA Agreement Rogers entered with CCD stated that Rogers' responsibilities included "[r]ecruiting, interviewing, checking references, hiring, . . . and dismissing each Attendant Care Worker." (Doc. 72 at 201).[5] Rogers testified that Able could take time off work without obtaining any permission from CCD, and that CCD was not involved in her selection and hiring of Abel. (Doc. 72 at 92, 140–141). CCD did not fire Abel. Rather, Rogers' managed care organization, United Healthcare, sent CCD a closure authorization which directed CCD to end its services to Rogers. (Doc. 83 at 39). CCD did not have power to hire or fire Abel.

*Whether CCD supervised and controlled Abel's work schedules or conditions of employment*. The evidence establishes that as an ACW employed by Rogers, Abel's work schedules and conditions of employment were determined by Rogers, not CCD. The FEA Agreement states that Rogers has responsibility over scheduling and managing Abel's work. (Doc. 72 at 201). The April Agreement states that Rogers' responsibilities include

---

[4] The April Agreement explicitly states that "I understand that Covenant Consumer Direct is the Fiscal and Employer Agency and assists the Member/PR with employer related tasks. Covenant Consumer Direct IS NOT my employer. The member/PR is my employer." (Doc. 72 at 196).

[5] The AHCCCS Medical Policy Manual, (Doc. 72 at 57), agrees: "As the employer of the ACW, the member has responsibilities including, but not limited to:

    a. Recruiting, interviewing, and hiring the ACW(s)

    b. Training the ACW(s) in the manner in which duties will be performed . . .

    g. Supervising ACW(s), including termination of employment if this becomes necessary . . . ."

"directing the day-to-day care of the Member and working out conflicts between the Member . . . and the ACWs." (*Id.* at 201). Rogers was in charge of ensuring that Abel didn't work hours when Rogers did not need care (*e.g.*, in the event she was hospitalized). (*Id.*). Rogers was responsible for preventing Medicaid fraud. (*Id.*). Rogers oversaw any required training for Abel. (*Id.*). Rogers also testified that, after the initial onboarding visits, her contact with CCD was limited to questions about payments to Abel, and that CCD did not control the services Abel rendered. (*Id.* at 132–34). In contrast, the FEA Agreement does not list any employee management or schedule control responsibilities under "Responsibilities of Covenant Consumer Direct." (*Id.* at 201–02). CCD did not even have the authority to determine the number of hours Abel worked per week. (*Id.* at 137).

*Whether CCD determined the rate and method of Abel's payment*. Rogers chose the rate at which Abel would be paid. While it is true that CCD gave Rogers a state-mandated range of pay rates to choose from, Rogers ultimately determined how much Abel would be paid for his work. The Wage Memo that Rogers and Abel signed stated explicitly that "[m]embers who self-direct their Personal Care Services are the managing employers. Along with their other duties and privileges, *they set their Attendant Care Worker's wage rate.*" (Doc. 72 at 198) (emphasis added). Abel cites language from the March Agreement that states that CCD sets an hourly wage for DCW's. But as previously discussed, the March Agreement is inapplicable here. Abel also cites testimony from Rogers stating that the Wage Memo was given to her with the section on wage rate already filled out—that the CCD representative had already checked the box for the highest pay rate. (Doc. 82-1 at 58). But there is no evidence suggesting that Rogers could not have changed the rate, and other papers she signed expressly gave her the authority to set Abel's wage. Further, all the documents indicate that Rogers was alone responsible for the payment of any overtime work which she directed.

\ \ \

*Whether CCD maintained employment records*. CCD did not keep employment

records for Abel. Under the April Agreement, Abel was responsible for maintaining copies of required certifications. (Doc. 72 at 196). CCD was responsible for payroll functions like withholding taxes. (*Id.* at 202). Rogers was responsible for tracking and approving Abel's hours, which she would submit to CCD for payment. (*Id.* at 201).

The four *Bonnette* factors and the "economic reality" of the arrangement between CCD, Rogers, and Abel, all demonstrate that CCD was not Abel's joint employer.

**B.      Bridgeway Advantage Solutions, Inc.'s Motion for Summary Judgment**

The undisputed evidence also establishes that Bridgeway was not Abel's joint employer. Since the FLSA claims and the Arizona state law claims are both premised on an employer-employee relationship between Bridgeway and Abel, Bridgeway is entitled to summary judgment in its favor.

*Whether Bridgeway had power to hire or fire Abel.* The evidence establishes that Bridgeway did not have the authority to hire or fire Abel. Rogers testified that Bridgeway was not involved in Abel's selection or hiring and could not have fired Abel. (Doc. 74-1 at 75).

*Whether Bridgeway supervised and controlled Abel's work schedules or conditions of employment.* Abel's argument boils down to a claim that by helping Rogers develop her Plan of Care and approving thirty-two hours of paid work per week for Abel, Bridgeway became his joint employer. That contention is incorrect. The Plan of Care was a tool used by Bridgeway to help Rogers determine what care she needed. (Doc. 74-1 at 121). It was a far cry from a controlling agreement dictating or controlling Abel's work.

Abel himself testified that Bridgeway never supervised his work in any way. (*Id.* at 40–41). Rogers testified that Abel needed no permission from Bridgeway before taking time off. (*Id*. at 29–31). Rogers was responsible for directing her own care and made all decisions regarding Abel's work for her. (Doc. 72 at 201). When Rogers' Bridgeway case manager visited her, the visits were about Rogers' health, not Abel's work. (Doc. 74-1 at 25). Abel testified that the case manager never met specifically with him. (*Id.*). Bridgeway did not monitor or evaluate Abel's performance, nor did it set a schedule for when he

1 worked. (*Id.* at 40–41). Abel cites no evidence to the contrary.

2 *Whether Bridgeway determined the rate and method of Abel's payment.* Bridgeway was not involved in setting Abel's pay and did nothing to determine the method of his payment. Abel was paid by CCD, not Bridgeway. (*Id.* at 31). Bridgeway paid CCD a flat, per-member fee for individuals in its programs, but that fee in no way affected the rate of Abel's pay. (*Id.* at 142–43). Further all the documents, including the agreement signed by Able, indicated that Rogers was alone responsible for the payment of any overtime work which she directed.

*Whether Bridgeway maintained employment records.* Abel has pointed to no evidence that Bridgeway maintained employment records for his work as Rogers' ACW.

The four *Bonnette* factors demonstrate that Bridgeway was not Abel's joint employer. Since there was no employment relationship between the two, Abel's FLSA and Arizona state law claims against Bridgeway fail, and Bridgeway is entitled to summary judgment.

**C. Summary**

Neither CCD nor Bridgeway were Abel's joint employers. The agreements signed by both Rogers and Abel show that Rogers, not CCD or Bridgeway, was responsible for the payment of overtime hours worked by Abel. Abel fails to point to any genuine disputes of material facts and has therefore failed in his burden of proving that either CCD or Bridgeway was his employer under the FLSA. *See Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999); *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-cv-00824JWS, 2018 WL 1088811 at *11, (D. Ariz. Jan. 7, 2018). He has therefore failed to establish an employment relationship under the Arizona Minimum Wage Act. *See* A.R.S. § 23-362(D). CCD and Bridgeway are entitled to judgment in their favor as a matter of law. *See* Fed. R. Civ. P. 56(c).

*/ / /*

*/ / /*

*/ / /*

**IT IS THEREFORE ORDERED** that the Motions for Summary Judgment of Defendants Covenant Consumer Direct LLC (Doc. 71) and Bridgeway Advantage Solutions Inc. (Doc. 73) are **GRANTED**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and dismiss the claims against Defendants Covenant Consumer Direct LLC and Bridgeway Advantage Solutions Inc.

Dated this 10th day of January, 2019.

G. Murray Snow
Chief United States District Judge